you may begin. May it please the court, I'm Ann Hayes and I represent the appellant in this action, Stephanie Watkins. Busy this week. Excuse me, sir? You're busy this week. And you are too, obviously. At the age of 10, Stephanie Watkins entered the United States with her family, her parents and her siblings. Along the way, she obtained legal permanent residence status. In her early 20s, Ms. Watkins was convicted of two theft offenses under Florida law. The events in this case were set in motion when she was put into removal proceedings and the immigration judge deemed those Florida convictions to be crimes involving moral turpitude. We now know that this was legal error. We now know that under the law as it exists today, the crimes that she committed were not crimes involving moral turpitude. And I don't think, I could be wrong, but I don't think the government will dispute that fact. In fact, the district court recognized that probably these crimes today would not be considered crimes of moral turpitude. So what we know today is that... To support your argument, that a change in the law is enough to make a proceeding fundamentally unfair such that you can lodge this collateral attack on the prior deportation order. That would be the Ninth Circuit case law, Your Honor. I'm trying to figure out what the Ninth Circuit... You're talking about Judge Graber's opinion in the Ninth Circuit? I'm talking about the case in United States v. Camacho Lopez. And that's cited in our case. And the court said that in that case, they said that when a conviction that was the basis for a prior deportation does not qualify as a basis for deporting someone under current law, then it's fundamentally unfair because the defendant was charged with removability only for having committed that offense. And the intervening cases, the court focused on was not a basis for removal. And he was removed when he should not have been and he clearly suffered prejudice. And that's the case here. And the reason, fundamentally, that that makes sense is that in this case, as in that case, the reason that the current law states that the theft offenses don't qualify as crimes involving moral turpitude involve statutory construction. The statutory language is the same today as it was in 2003, as it was in 2003 at the time that she was deported, at the time of the 1996 immigration judge proceedings. So if that language, the same statutes, today establish that those crimes were not crimes involving moral turpitude, certainly that was the case then. But this was a hidden error at the time. It was a hidden error. This camp case hadn't been decided until some years later, until 2013. And so, unfortunately, Ms. Watkins was deported based on these crimes that are not crimes involving moral turpitude. And we know that now. At the time, we didn't know that. And so she was sent out of the camp here, sending her back to Jamaica, where she had not lived since the age of 10. Ms. Hayes, let me ask you a question. Yes. You're asking us to take as a given that this is no longer a crime involving moral turpitude. And I assume you're basing that upon the decision of the Board of Immigration Appeals, and I can't pronounce this, but do you view for violence as what it is? That's the case you're relying upon, correct? Yes, Your Honor. And that is an unpublished opinion not intended for citation as precedent, isn't it? That's correct, Your Honor. Well, and then this court in 2009, in the Alto Morano-Torres case, just took as a given that it involved moral turpitude. So we got two, both unpublished decisions, one of this from the Immigration Appeals Court. Do we really need to get into the whole question of whether we should retroactively apply that to help your client or not, if we really aren't sure that that is the case, that it really is not a crime of moral turpitude? And what I'm asking out loud is, when you have a question of state law, which is what this is, and you have no decision from a Florida court that says it does not involve moral turpitude, would this be a candidate for certification under the Uniform Act to the Supreme Court of Florida to answer that question authoritatively? Then we, if the answer from that court is it is not a crime of moral turpitude, then we have to get into the question of whether you give her the benefit of that decision in this case. Your Honor, I don't think that this is a good case for certification to a state court, simply because the concept of crime involving moral turpitude is a federal concept rather than a state concept. So we aren't relying on state law in this case to determine the nature for the purposes of the immigration proceedings. And we did cite two cases in our briefs from the Board of Immigration Appeals, and they were unpublished opinions. And I can tell you, and if the court would find a benefit from knowing that there are more cases, there are five other cases after that, unpublished cases from the Board of Immigration Appeals, saying that this particular Florida statute is not a crime involving moral turpitude. Does it matter whether there are cases from either, well, does it matter whether there are unpublished cases, whether they're from our circuit or BIA, when there is a Supreme Court case, DECOMP? I mean, is it incumbent upon us to conduct the analysis ourselves under DECOMP, regardless of whether there are unpublished cases from our circuit or from the BIA on whether this is a crime involving moral turpitude? Yes, Your Honor. And particularly, as Judge Titus mentioned, he noted an unpublished 2009 decision from the circuit. And of course, that precedes DECOMP. And DECOMP is going to have a different result, a different effect. So just to make sure I'm understanding your answer, you're saying even if there were no cases at all, whether published or unpublished, from BIA and the 11th Circuit, that your position is that it would still be incumbent upon us to conduct our own DECOMP analysis to see whether, in fact, DECOMP renders this crime not a crime involving moral turpitude? That is my position, Your Honor. And it's also my position that where there are numerous, and albeit unpublished and albeit not precedential, decisions from the Board of Immigration Appeals addressing this very statute and consistently reaching the same result, that that's a pretty good indicator we at least know that if Ms. Watkins were facing deportation proceedings today, it's extremely unlikely that she would be deported. So at the get-go, at the beginning stages, there's a mistake in terms of if we look at how the immigration courts are behaving now, we know that she would not be deported on the basis of these crimes. And so, yes, this court should certainly take every measure in making sure that a grave injustice is not perpetuated in this case. Ms. Hayes, could Ms. Watkins have challenged this deportation order before coming back into the United States? Not on the grounds that are available today, Your Honor. I mean, unfortunately, she did take matters into her hands. It's not something that I would view as a good practice. But she did re-enter the country. From my understanding, she was back into the country prior to the decision in the Descamps case. So would you just walk through a timeline with me for a moment? Sure. The deportation order was entered in, was it 2003? 2003. Okay. Then Descamps comes out, is that 2010? 2013, I think, Your Honor. Okay, thank you. Then she files, well, she gets arrested in this case. 2016. Okay. And then she files her motion to reopen and her challenge with BIA after she gets arrested? That's right. Okay. So I'm going to tell you what I'm thinking. This is a little strange maybe, but as I was thinking about this case some more, all of a sudden I started thinking about this case called Robert Johnson, which is a Supreme Court case that's issued in the context of was convicted and sentenced under the ACCA. And after he was sentenced, he sought to vacate the underlying state crimes. And then he filed, I believe he filed a second or successive ACCA claim. And the question was, saying that he no longer had the necessary three qualifying crimes. And so the question was whether he could do that and whether he had timely done it. And in that case, what he did was he waited for more than three years after he had been sentenced under the ACCA to file it. And the Supreme Court said, he could have done it, and we would have been applied to him, but he waited three years and he wasn't reasonably diligent because he waited three years in doing that. And I'm not sure whether that concept can be applied here. Obviously it's 2255 law as opposed to here. And here we've got a statute that we're working with, but I still have to construe the second requirement of the statute. And I'm sorry to ask it to you without any notice, but do you have any thoughts at all on that? I do. And so I also will refer to the 2255 context. And I also will mention a theory that hasn't been briefed, but I think it's just so obviously parallel to the situation here, that if I might use some more time, I'll tell you where I'm going with that. And I'm thinking of Bosley v. United States, which was a habeas case. And that was one where it was 924C and they just had decided that- No longer a crime. Exactly. No longer a crime. Just like here. No longer a crime. And so in Bosley they addressed the theory of actual innocence. Actual innocence, the court said, did not even require the court to look at- actual innocence, they said, was a way to get past the procedural barriers, the time limits. And then in a subsequent case, McQuiggan v. Perkins, the court actually specified that under the ADEA, which has the time limits, that actual innocence didn't just create equitable estoppel, but it excused conformance with time limits. It was an exception to time limits. And so if we're going to be analogizing to 2255 cases, I would ask the deportation proceedings, she would not be subject to deportation under current law. And that's an appropriate way to look at that. And if I might just take another 30 seconds, I would say as far as administrative review and judicial review being available, of course they weren't. Because the case that is driving her claim today was not available during the hearing. Thank you. Ms. Hayes, we'll hear from Mr. Colan. Good morning. May it please the court, Jonathan Colan on behalf of the United States. With me at table is Michelle Vigilance who handled the case in the district court. Stephanie Watkins returned to the United States as early as 2008 when she applied for her fraudulent driver's license without having attempted to rescind her removal order, without having sought the permission of the Department of Homeland Security, and as counsel admits, five years before the DECOMP decision even created any arguable right for her to contest her original removal order. Her argument today is that she can contest it by having violated it. That is not what 1326D allows. That is not what this court's Zelaya decision allows. In Zelaya, this court stated that the failure to having sought rescission of a removal order constitutes the failure to exhaust her administrative remedies. If she had wanted to contest it at the time before her removal, she could have. In fact, she did. This court has said that the purpose of 1326D, the due process right at stake, is the right notice and an opportunity to seek relief from the BIA. It does not matter whether you would have won. It's the opportunity to have sought that relief. But doesn't that have to be meaningful relief? And if the right didn't exist, or a meaningful opportunity, if the right didn't exist until 2013, and now we're just assuming for purposes of this discussion that there is a right, if the right didn't exist until 2013, then how could she have had a meaningful opportunity to seek relief until 2013? Well, first of all, I just want to note that the government is not conceding that Florida grant theft would no longer be considered a crime of moral turpitude. That's why I said we're... I want to just note that. We can come back to it if we wish. Yes, that's why I said we're assuming it for purposes of this discussion. Sure. But in many contexts, ACCA, Savings Clause, and others, courts have recognized that the opportunity to present an argument does not depend on the success of your argument. You could be the one who went to the BIA and appealed to this court or to the Supreme Court and establishes what at the time was a new law or a new recognition of how the law should be interpreted. If she had wanted to present that argument to the BIA or appeal to this court prior to her removal, that her removal should not have been justified, she had the opportunity to be the person, like Decomp, who can create new law. But having had her chance to appeal, and she did to the BIA, and then having been removed under a lawful order at the time, it is simply lawless to say that a person who has been removed can just return, and in the event, sometime down the line, if the core law ever changes, because she admits Decomp itself, which doesn't resolve the issue, merely creates the divisibility framework which could lead to an argument, came five years at least after she obtained her fraudulent driver's license when she returned to the United States. If she's ever arrested somewhere down the line and then tried for illegal reentry, at that point she can contest her removal. That's simply not what 1326D is about. The purpose of 1326D is to ensure your due process rights, that you had chances to contest your removal prior to the fact. And if some change in the law addresses whether your notice was proper, that would be something that 1326D would allow. But to say that an alien, I have to dispute my colleague here and say that she could have, prior to entry in this country, if she believed after Decomp that there is a new legal framework that would change whether her crime should be considered a crime of moral turpitude, she could apply to the BIA to rescind her removal order. Or if she felt that process was inadequate, she could make that same equitable argument and appeal to the discretionary powers of the Department of Homeland Security and say I was removed and even though that order was valid at the time, changes in how we've recognized crimes of moral turpitude meant I should never have been removed. Can I have permission to reenter the country? That's the process that we have. We don't simply allow aliens to say unilaterally on their own decision, I think the law has changed and I think I should have been allowed to say I'm just going to reenter the United States, obtain a freight driver's license, and I'll bring it up later if I'm ever on trial for illegal reentry. I mean, I agree that it's problematic that she came in while there was an outstanding deportation, well, she had been deported. I mean, there's no question about that. But now we have a new crime, right? And the new crime is based on there having been a valid deportation order. I understand that your position is, well, there was a valid deportation order because it was valid at the time. But if it's not, if under current law, it wouldn't have been issued, I mean, that also raises some troubling concerns, I think. And I think this is something we tried to address in our brief in terms of looking back. In an ACCA case, as Your Honor brought up, if this were a current sentence, and the question is, could you now be sentenced to an enhanced statutory sentence based on your prior crime, then your pending decision as to whether you should be given an extra long sentence, you would look back and see what those prior crimes are construed as today. But you wouldn't let a defendant violate an existing lawful sentence by escaping. And then if they're arrested and tried for the escape, say, well, I should never have been in prison in the first place. That sentence, even though it was lawful when it was handed down, today would never have been given out. So the question of whether today she would ever have been removed is like the person saying, well, today I wouldn't have been sentenced to the enhanced statutory mandatory sentence. At the time, though, it was lawful. And that's what separates this case from the ACCA context. And while you can't look back... What are her options then? What's her remedy? If it's her view that the Florida grand theft is no longer a crime of moral turpitude, does she still have a remedy? Well, which she would have prior to her returning to the United States. If she had, abroad, looked at the comp and said, you know what? I think the law in the United States has changed. I know your argument is this is what she should have done. Asking, does she still have a remedy? Well, I mean, the context is different. She has now committed a new crime. I mean, the crime of illegal reentry has been committed. She returned without the permission of the Department of Homeland Security and without having sought rescission of the order. So she has no remedy? Well, she was validly committed to this crime. If she wants to contest her original removal, I'm not sure what relevance it has after having committed the crime of illegal reentry, you know, which is what's at issue here today. As to her ability to reenter the country now, I mean, she still has the same right to apply. Does she have the right to go back to the BIA to apply to rescind her removal order? I'm not sure. I mean, you know, she's now been removed from this crime. So she can certainly apply. As to the merits of her argument, I think they would probably be pretty weak. One can always ask. One can certainly always petition to the Department of Homeland Security and explain the situation and appeal for discretionary relief. But I think the merits of her argument would have to take into account the subsequent fact of her having committed the crime of illegal reentry. You simply can't just pretend that the intervening years have not happened. Although that's exactly what the court does in Johnston, right? In Johnston versus Roberts. I mean, different context, 2255. But the court says, hey, you know, it doesn't matter that seven years have passed since the guy was sentenced for his multiple convictions in state court. If he can get them vacated after his ACCA sentence is imposed within a reasonable period and he's diligent about it, all is forgiven, we're going to vacate that sentence and we're going to allow resentencing. And that's in the context of a sentence, not just a conviction. So, I mean, I don't know if you want to address that. I mean, well, I'm not as intimately familiar with the case, but I think the key distinction you've just made is that he's seeking to rescind or vacate that existing sentence. That's different from him having escaped and violating the sentence and then saying, when you try to convict me for that escape, I should never have received the sentence. What the situation you've described is more akin to someone who prior to illegally returning seeks to rescind the removal order. But it's really not because in Johnston versus, sorry, in Robert Johnston, that's the name of the case. In Robert Johnston, he did not seek to have his state convictions vacated prior to committing the crime which landed him in jail that subjected him to the ACCA enhancement. So it seems to me that it's actually quite similar. I mean, I have to disagree, Your Honor, because I think the context is The analogous situation would be she's before the court on a removal today. And if she were to say to the court, I shouldn't be removed today because of those prior convictions. Let's go back and recontest what that conviction should be looked at. That's the imposing of the sentence today. Having had that removal order, which I say is akin to having had that sentence imposed in Johnston, the removal order is akin to the sentence in Johnston. You can't contest the removal order by violating it, just as Johnston can't contest that sentence by disregarding it and walking out of prison. Her being removed is akin to Johnston being in prison. When you're in prison, your remedy is to go to court and say that sentence should be vacated, and here's why. Her remedy was when she was out of the country to apply to the BIA and say my removal order should be rescinded, and here's why. Or if for some reason that was inadequate, she has the discretionary right or the right to appeal to the Department of Homeland Security for permission to reenter the country. But, I mean, this is a classic case of you can't contest an order by violating it. It would be as if Johnston said, instead of applying to the court to rescind or vacate my sentence, I'm just going to unilaterally walk out of prison. And if I'm arrested and put on trial for that new crime, the illegal reentry into society, as it were, I'm going to contest the basis of my sentence. Except that 1326D does say that you can collaterally attack the underlying deportation order. I mean, that seems different to me. Yeah, and in the cases where this court and the courts generally have looked at an applied 1326D's ability to collaterally attack, it's been in the context where we think there was some due process violation at the get-go. At the time, there was some problem with your notice of your ability to go to the BIA to contest the immigration judge's removal order. It has not been. The Ninth Circuit has gone the other way, and we've argued in our brief why the Fourth Circuit's opinion, we think, is more attuned to the law and in compliance with this court's decision in Zelaya. And frankly, I'm not sure what the right answer is, but I would like to explore with you why the answer wouldn't be that under 1326D there are the three requirements. Everybody seems in this case to be in agreement that exhaustion is met. That leaves the other two. Well, no, actually I have to, again, clarify the government's position, Your Honor. I think under Zelaya, this court held at page 1297 that the failure to seek rescission of the removal order from the immigration courts is the failure to exhaust your administrative remedies. So I think under Zelaya we would not have exhaustion in this case. But as to the fundamental unfairness prong, the fact that the removal order was lawful at the time is what the Fourth Circuit has held. It's what Judge Graber, in his concurring opinion in the Ninth Circuit, argues, and it's what the government's position here is today, is that the fact that the decision was lawful at the time means it was not fundamentally unfair. The fundamental unfairness that 1326D is meant to address is the kind of due process violation where there was some flaw in your ability to contest it at the time. The remedies for intervening change in the law are not just to return. They are to seek the rescission of your permission. So we think that the 1326D context is not meant to address someone who just unilaterally returns and now is trying to contest a lawful order based on intervening changes, not to the process that led to the removal, but to the legal basis for it. Those are separate remedies. Mr. Colon, before you run out of time, I had a question for you. What is the position of the United States on whether this is or is not a crime involving moral turpitude? First, we would say that Descamps did not resolve that. That merely creates the framework of the divisibility. And while the BIA has held that Florida grand theft is not a crime involving moral turpitude, the basis for its decision was on a distinction between temporary and permanent takings. That is something that this court has never addressed. As far as I could determine, that is something only that the BIA has discussed. So I think in this circuit, that is not a resolved issue. The last time this court has discussed whether Florida grand theft is a crime of moral turpitude, as has been noted, this court has assumed that it was. Except that was before Descamps. It was before Descamps. Let me ask you this way. Is it your position that temporarily and permanently is divisible? Because I don't think it is. I mean, I think the statute is divisible under the first and second alternative paragraphs, but not as to temporarily and permanently, which is how it matters here. But maybe you have a different position. It's hard to say. This could be one of those cases of means versus elements. But what the government's position is, is that it's an entire quagmire that is not. Okay, I see you don't want to answer it. But, I mean, is the reason you don't want to answer it because you kind of know that, in fact, it is not divisible temporarily and permanently. I think it would be difficult to say that it is divisible. But rather than this court having no lower court ruling on the matter, having no Florida case addressing it, it would be an odd procedure for this court in an appeal from an illegal reentry case to, as a matter of first instance, try to resolve that question. The better practice the government holds is to say that 132060 does not allow that kind of legal challenge to someone who violated the law when there was no basis in the law for her doing so, merely unilaterally returning on her own authority. We believe her conviction should be upheld. Thank you. All right. We'll hear again from Ms. Hayes. Thank you. I would like to note first, in terms of whether this crime is a CIMT, this court held in 2013, and, of course, it's a common principle, that this court should refer to the BIA on issues concerning the matters that it decides. And I know that the BIA decisions that were relying on this case are unpublished, and yet it's still, as far as I can tell, the best source to look at for a meaningful, thoughtful analysis of whether this crime is a CIMT. Can you address Mr. Colan's escape analogy, please? Yes, I can. What we had here was an administrative proceeding, not a criminal proceeding, as far as the removal. It was an administrative proceeding where Ms. Watkins was ejected from this country. She was in Jamaica, and, yes, ultimately she was here. But the idea, on the prison break, someone who's convicted of a crime, the avenues for relief are abundantly clear to a person in that circumstance. If you're in prison and the Bowsley case comes out, everybody in your community knows that you have a legal right to challenge that and how to do it. Ms. Watkins didn't have that benefit. Ms. Watkins, there was no lay person in this country, let alone in Jamaica, knows what DECOMP is and what effect it would have on her prior convictions. So it's absolutely unreasonable. It's an illusory right to think that she's going to be aware that there's been a change in law that benefits her. And on that point, I mean, it was, yes, it was a legal deportation at the time, but something happened. A lawful order became an unlawful order. And as far as a conviction under 1326, an element is having that prior deportation order. And justice requires that that be a valid deportation order. Justice, common sense, and a little pinch of mercy suggest that that has to be a valid deportation order for it to happen. And, yes, Ms. Watkins came back to this country without having this issue resolved. And she did. And so as we look at it today, she thought she was committing a crime. Maybe at that point the court would have found it to be a crime. But we know today it's not a crime. And there's a doctrine of impossibility. If you do something, you think it's a crime and it's not a crime, it's not a crime if the elements aren't met. If I go to my neighbor's house and I take his lawnmower and I think I'm stealing it but he thought he gave it to me, it doesn't matter if I'm furtive and sneaky and put it in my garage and hide it under a tarp. It's not a crime. And that's the same circumstance here. So in the end, I would ask the court to reverse Ms. Watkins' conviction. Thank you. Thank you, Counsel. And Ms. Hayes, you were appointed by the court to represent Ms. Watkins and the court thanks you for your assistance. The next case is Pressley v.